## CIRCUIT COURT OF THE CITY OF RICHMOND

In re Trust
under the Will of
Nicholas A. Somma,
deceased

June 14, 1999

BY JUDGE RANDALL G. JOHNSON

In this rather unusual case, the court is asked to decide whether a trustee has violated his fiduciary duty by subjecting trust funds to investment practices known as "day trading," "calls," and "margins."

Nicholas A. Somma died in 1985. His will established a trust known as The Nicholas A. Somma Scholarship Fund, which was to award "no more than two scholarships per year of One Thousand, Five Hundred ($1,500.00) Dollars each to needy students graduating from Highland Springs High School in Henrico County, Virginia." Nicholas Somma's brother, William A. Somma, qualified as trustee. In 1988, when it became obvious that the trust was substantially larger than contemplated by the testator, William Somma petitioned for and obtained an order from this court giving the trustee the discretion to award from the income of the trust as many scholarships, and in whatever amounts, as the trustee deemed appropriate. William Somma died in October 1992. In November 1992, Charles A. Somma, Jr., another of Nicholas Somma's brothers, qualified as successor trustee. Charles Somma is a licensed attorney. (As used in this opinion from this point forward, the name "Somma" will refer to Charles Somma, not to the decedent and not to the original trustee.)

The matter is before the court on Somma's annual accounting for the period July 1, 1997, to June 30, 1998. In filing the accounting with the court, the commissioner of accounts took "formal exception" to the three investment practices referred to above — day trading, calls, and margins. The commissioner stated in his report that, after approval of the last accounting, he had advised Somma that those investment practices were unacceptable and should be terminated immediately. Because the latest accounting makes it

clear that such practices were not terminated, the commissioner disapproved all of the commissions paid to the stockbroker employed by Somma and all of the margin interest, a total of $77,418.75.[1]

Within the fifteen days allowed by Va. Code § 26-33, Somma filed exceptions to the commissioner's report. Generally, Somma stated that his investment practices were actually conservative, and that they benefited the trust. He stated that his use of calls and "covered calls" had resulted in a net gain of $106,748 during the accounting period. He also claimed that his day trading, referred to by Somma as "short-term trades," made a net profit of $56,705. Scholarships totaling $20,297 were awarded. Somma also stated that he did not recall the commissioner telling him to terminate the questioned practices. A hearing on Somma's exceptions was held on June 7.

The accounting shows more than 600 separate investment transactions during the accounting period. Many transactions involving a single investment occurred on the same day or within one or two days of each other. Such transactions are known as "day trading." For example, on July 1, 1997, Somma purchased 5,000 shares of Cellular Technical. He sold all 5,000 shares on July 2. On July 7, 1997, Somma purchased 7,500 shares of Viragen, Inc. He sold all 7,500 shares two days later. Also on July 7, he purchased, sold, then purchased again 1,000 shares of Jones Med Inds, Inc. All 1,000 shares were then sold on July 8. Similar trades occur on almost every business day throughout the year.

The second investment practice challenged by the commissioner involves calls. The court does not profess to be an expert on investments generally or on the stock market in particular. As explained by Somma and his stockbroker at the hearing, however, and as the court generally understands the practice, a call is an investment instrument by which one person agrees to sell to another person a specific number of shares of stock at a specific price on a specific day. It is a way to make money on stock that neither goes up nor down

---

[1]  In the recent case of *In re Trust under the Will of John Moseley Southall, deceased,* Case No. 98-415 (decided June 7, 1999) [printed above at page 169], this court discussed what is probably an improper use of the term "exceptions" by the commissioner of accounts. Under Va. Code § 26-31, a commissioner of accounts files a fiduciary's accounting together with the commissioner's report of the accounting. In the report, the commissioner must "specially state[]" any matters "deemed pertinent by the commissioner, or which may be required by any person interested to be so stated." *Id.* It is the fiduciary or any other interested person that can then file *exceptions* to that report. As was true in *Southall,* the court will treat the commissioner's "exceptions" as matters "specially stated" by the commissioner under the statute.

in price and a limited protection, or "hedge," against a decrease in the price of stock. For example, if Seller A owns 100 shares of stock in the XYZ Company at $100 a share, she might sell ten "calls — XYZ Company" to Buyer B for $5 each, each call requiring Seller A to sell to Buyer B 10 shares of XYZ stock at $100 a share on August 1, 1999, the day the call becomes due or "expires." On August 1, Buyer B has the right to buy Seller A's 100 shares at $100 each, but does not have to buy them. Naturally, if XYZ is selling for more than $100 a share on August 1, Buyer B will exercise his right to buy the stock, as long as it is selling at a price high enough for him to also recoup the $50 paid for the calls. If XYZ is selling for less than $100 a share, Buyer B will not exercise his right to purchase, since, if he really wants the stock, he can buy it for less on the regular stock exchange. From Buyer B's perspective, it is a way to buy stock at a discount, assuming the price of the stock goes up after he purchases the calls. From Seller A's perspective, it is a way to guarantee some return on her investment; that is, if the price of her stock has not risen appreciably by August 1 or even if the price has gone down, she at least has the $50 she received from selling the calls. The price of a call and the price at which the stock must be sold when the call expires vary from day to day and stock to stock, depending on all of the same factors that affect the stock market generally.

Of course, there are risks associated with calls. If the stock goes down in price, the buyer loses since it makes no sense to buy stock at the agreed-upon price when he can buy it on the regular stock exchange at the then prevailing lower price. He does not get back the money he paid for the calls. If the price rises beyond the break-even point for the buyer, known in the market as being "in the money," the seller loses since she will not realize the profit she would have made if she were free to sell her stock elsewhere. With regard to the latter point, however, the seller has a further option. If she wants to hold on to her stock, she can "cover" the call at any time before its expiration date. Thus, if on July 15 XYZ has already gone "in the money" or appears likely to do so by August 1, the seller may "cover" her calls so that she will not have to sell. Like the price of the call itself, the cover price is determined by market factors.

Somma engaged in the practice of selling and covering calls. Of the more than 600 separate transactions that occurred in the accounting period, almost 200 of them were selling or covering calls.

The final practice questioned by the commissioner is Somma's use of margin accounts. A margin account is a means by which an investor borrows money to buy stock. The collateral for the loan is the stock in the investor's brokerage account. The lender, which is the brokerage firm, charges interest on the loan and, under certain conditions, can call the loan due. When called

due, the investor has so many days to "settle" the account; that is, to repay the loan. If the loan is not repaid, a quantity of stock in the margin account sufficient to repay the loan is sold. For the period in question, more than 80% of Somma's investment transactions were done on margin. At the end of the period, the margin balance was $129,573.34, having reached a balance of almost $280,000 at the end of February 1998. For the period, Somma paid margin interest of $12,080.75. The total value of the trust at the end of the period was $385,281.67.

As noted earlier, Somma does not contest the fact that he engages in the practices described. In fact, he stipulated at the hearing that his transactions are so many and so frequent that a total of $65,338 in brokerage commissions was paid during the twelve months in question. He claims, however, that even after the payment of those commissions and margin interest, the trust made a substantial profit during the accounting period as a direct result of his actions. With regard to day trading, Somma claims that the trust made a net profit of $56,705 from "short-term" trades. That simply is not true. Somma's own Exhibit 3, which is his accountant's breakdown of Somma's investment activities for the year, shows that Somma's stock trades actually *lost* $31,156 for the year. Still, Somma argues that he generally sold stock for more than its purchase price and that his losses were simply the result of a volatile and unpredictable stock market. Moreover, he claims that those losses were more than offset by gains made by selling and covering calls.

According to Somma and his accountant, the trust made $106,748 by selling calls during the accounting period, even after deducting the cost of covering calls already sold. What Somma and his accountant have not done, however, is to calculate how much the trust would have made if those calls had not been sold. In other words, what was the June 30, 1998, value of all of the stock that was sold on call? If it was less than the price at which all of the stock was purchased, then the trust did, indeed, make money. If the value was higher, the trust lost the profit it would have made by simply holding the stock until the prices rose, which most stock prices eventually do. As the commissioner also points out, Somma and his accountant have also failed to take into consideration, when they brag about the "tremendous" profit made on calls, that by engaging in day trading and call transactions, the trust missed out on nearly all of the dividends paid by the companies they ever-so-briefly owned. Without knowing what those dividends would have been, the commissioner, the court, and nobody else can say that Somma's call and day-trading transactions benefited the trust at all.

Moreover, by looking at gains made by selling calls without looking at the total performance of the trust's entire stock portfolio, which Somma urges,

Somma would have the court ignore a fundamental fact: *there can never be a "discreet" loss from call activity.* When a call is sold, the seller receives a payment. If the inquiry stops there, as Somma would like it to stop here, there can never be anything but a gain. A payment is received — a gain has occurred. In this case, $106,748 was received. Somma says that is the trust's gain. The inquiry, however, cannot stop there. Only by looking at what would have happened had the call *not* been sold can a true picture be obtained. If the price of the stock covered by the call has gone up in value, no money is taken from the call seller's pocket. Even so, the seller of the call has suffered a loss: the higher price he or she could have received if the stock were sold on the open market. While Somma tries to say that such loss is only a "paper" loss, the court considers it a real loss. As already noted, however, the court has no way of knowing what those losses are in this case because neither Somma, his accountant, nor his stockbroker informed the court of the value of any of the stock sold by Somma on call. And the court knows that the price of all stock sold on call was higher than it was when the call was sold because if it was not, the holder of the call, as already discussed, would not have bought it.

On June 30, 1997, the trust had total assets of $469,998. With the exception of one parcel of real estate valued at $64,000, that amount consisted entirely of stocks, bonds, call options, and cash. On June 30, 1998, the trust had total assets of $385,282. Even after consideration is given to the fact that $20,297 was awarded in scholarships and $12,200 was paid in expenses, that is a loss of over $52,000, or 11% of the trust's assets. At a time when the Dow Jones Industrial Average increased by 16%, the Standard and Poor's 500 increased by 28%, and the NASDAQ Composite increased by 31%, the court is not at all impressed by Somma's investment prowess.[2] If Somma had simply bought and held good stock, or even if he had simply bought and held federally insured bank certificates of deposit, the trust would have fared much better than it did under his frenzied market activity.

It is also not difficult to determine where the loss occurred. Contrary to Somma's and his stockbroker's wishes, the court does look at "paper losses" as losses. What has happened is that by day trading and selling calls, Somma has given the trust very little opportunity to make a profit. This is because when a call is sold, the stock covered by that call will be lost if its price goes

---

[2]  The stated percentages are obtained by comparing the subject indexes' values on June 30, 1997, and June 30, 1998. For the Dow Jones Industrial Average, the values were 7,672.8 for June 30, 1997, and 8,952 for June 30, 1998. For the Standard & Poor's 500, they were 885.14 and 1,133.84. For the NASDAQ Composite, they were 1,442.07 and 1,894.74. The index values were obtained from the Yahoo! Internet Site, at www.yahoo.com.

up unless the trust spends money to cover the call. If the price goes down, the stock is not sold or is sold at a loss. Naturally, the only stock left in the portfolio will be stock that is worth less than it was when purchased and stock for which the trust has paid an extra premium by covering a call. Either way, it is no surprise that in spite of the $106,748 made by selling calls, the trust had a loss of $52,000. Indeed, as of June 30, 1998, what Somma and his broker call a "paper loss" amounted to $116,611. In other words, the value of all of the stock owned by the trust at the end of the accounting period — that is, stock that had not been sold on call or otherwise — was $116,611 less than what the trust had paid for such stock. And that loss occurred during one of the greatest bull markets in world history as evidenced by the above-noted increases in the market's three most recognized stock indexes.

Virginia Code § 26-45.1(A) provides, in pertinent part:

[I]n acquiring, investing, reinvesting, exchanging, retaining, selling and managing property for the benefit of another, a fiduciary, whether individual or corporate, shall exercise the judgment of care, skill, prudence and diligence under the circumstances prevailing from time to time, (including, but not limited to, general economic conditions, anticipated tax consequences, the duties of the fiduciary and the interests of all beneficiaries) that a prudent person familiar with such matters and acting in his own behalf would exercise under the circumstances in order to accomplish the purposes set forth in the controlling document. In investing pursuant to this standard, a fiduciary shall consider individual investments in the context of the investment portfolio as a whole and as part of the fiduciary's overall investment plan and shall have a duty to diversify investments unless, under the circumstances, it is prudent not to do so. Any determination of liability for investment performance shall consider not only the performance of a particular investment, but also the performance of the portfolio as a whole.

As already noted, this court does not profess to be an expert in investing or investment practices. Nor is it the function of the court to tell fiduciaries how to invest estate and trust money. The General Assembly has, by the enactment of Va. Code § 26-45.1 and related statutes, given fiduciaries broad discretion in managing the funds with which they are entrusted. Those same statutes, however, also place limits on that discretion. The court finds that those limits were crossed by Somma in this case.

The Nicholas A. Somma Scholarship Fund has as its only purpose the awarding of college scholarships to "needy students graduating from Highland Springs High School." It has no other purpose. While it would be nice if the fund realized gargantuan gains every year, that does not need to happen for the trust's purpose to be accomplished. What does need to happen is for the fund to realize *some* gain each year. With a balance of almost $470,000 at the beginning of the accounting period, and if the commissions and margin interest paid by the trust are excluded, even a modest return of 10% would have generated more than the $20,297 actually awarded in scholarships. A return more in line with any one of the aforementioned indexes is even more realistic. The practices engaged in by Somma prevented that from happening.

The court does not believe that Somma engaged in the investment practices at issue in order to derive any personal gain. His commission of $5,700, but for the problems already discussed, is reasonable for a trust this size, and there is no evidence that he has received any other payments. In fact, the court does not know why he engaged in those practices. Perhaps he did it for the thrill of being a "player" in the market. Whatever the reason, however, the court does suspect that he was improperly influenced by his broker.

Somma's stockbroker's liability for loss to the trust is not now before the court. The court cannot help but note, however, that Somma and his broker have offices in the same building. In fact, they are just across the hall from each other. The broker and Somma would meet in the broker's office daily or even several times a day to discuss and make trades. Each trade generated a commission for the broker, including each sale of a call and each cover of a call, and such commission was due whether or not the trade generated a profit for the trust. As already noted, commissions totaling $65,338 were paid to the broker during the accounting period. An additional $12,080.75 was paid to the broker's firm as margin interest. That is a total of $77,418.75. Whether the broker's activity amounted to illegal "churning" simply to create commissions, as the commissioner of accounts suggests, is, again, not before the court. The court does find it more than a little interesting, however, that during his testimony, Somma's broker said he tries to "stay away from" working with fiduciary accounts. Whether that is because he knows of some prohibition against brokers engaging in the activities at issue here while handling such accounts or because most fiduciaries do not permit such activities and, consequently, such large commissions to be made, the court does not know. The court does deem it appropriate, however, to send a copy of this opinion to the Attorney General of Virginia and to the Commonwealth's Attorney for the City of Richmond and will leave it up to those officials to determine if an investigation or other action is appropriate. The court also expresses no

opinion on whether Somma or the trust has any cause of action against the broker and his firm to recover the commissions and margin interest paid. That will be up to Somma to decide.

What is before the court is the commissioner of accounts' report charging Somma with the $77,418.75 paid as broker commissions and margin interest. That is a significant sum. Considering the questionable activities at issue, however, as well as the commissioner's warning at the end of the previous accounting period and the dismal performance of the trust as a whole and cognizant of the solemn duty imposed by law and society upon fiduciaries, the court can think of no other appropriate action. The commissioner's report will be confirmed.